UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| UNITED STATES OF AMERICA | ) |  |
|---|---|---|
|  | ) |  |
| v. | ) |  |
|  | ) | Docket no. 2:17-cr-140-GZS |
| MARIO GARCIA-ZAVALA, | ) |  |
|  | ) |  |
| Defendant. | ) |  |

**ORDER ON PENDING MOTIONS**

Before the Court are two motions filed by Defendant Mario Garcia-Zavala: (1) Motion to Suppress (ECF No. 29) and (2) Motion to Dismiss (ECF No. 31). The Court held an evidentiary hearing on both Motions on December 20, 2017. Thereafter, the Court received post-hearing briefing from counsel (ECF Nos. 43, 44 & 45). As explained herein, the Court now DENIES both Motions.

**I. FACTUAL FINDINGS**

The following facts are drawn from the preponderance of the evidence based upon the Court's review of the exhibits and testimony presented at the hearing on Defendant's Motions.

**The Traffic Stop**

On the afternoon of Saturday, September 9, 2017, Maine State Trooper Robert Burke III was on patrol in Portland, Maine. While parked perpendicular to Washington Avenue, he observed a white passenger van traveling down the roadway and proceeding to merge onto I-295. From his vantage point, he could see the front seat passenger, who appeared to not be wearing a seat belt,

which would be a violation of 29-A M.R.S.A. § 2018(3-A).[1] Burke made a decision to conduct a traffic stop. After activating his blue lights, he pulled the van over on the highway in the area of Tukey's Bridge. At approximately 12:20 PM, Trooper Burke approached the van and asked to see a license, registration, and proof of insurance. Trooper Burke then moved to the passenger side of the van and asked, "You have your seat belt on?" As captured on the videotape (Gov't Ex. 1)[2] and transcript (Gov't Ex. 1T), someone in the vehicle answered, "yeah." Burke asked a couple of other questions and, based on the minimal responses, asked if anyone in the van spoke English. He then returned to the driver's side of the van repeating his request to see the driver's identification. Before returning to his vehicle, Trooper Burke remarked at least two additional times that multiple people in the van did not appear to be wearing seat belts and did not appear to speak English.

Upon returning to his vehicle with only a vehicle registration for the van, Trooper Burke placed a call to Elliot Arsenault, a Deportation Officer for Enforcement Removal Operations with Immigration and Custom Enforcement ("ICE").[3] Arsenault answered this call at approximately 12:22 PM. Burke told Arsenault he had stopped a van for a seat belt violation and now had "a van load of fucking I don't even know what . . . of about 13 that nobody speaks English. Nobody has

---

[1] Based on the Court's own review of the dashboard camera video (Gov't Ex. 1 & Def. Ex. 6) and the totality of the evidence received, the Court concludes that the primary motivation for the traffic stop was an observed seat belt violation. To the extent that some evidence also suggests that Trooper Burke may have been motivated to conduct this traffic stop based on observing a cracked windshield, the preponderance of the credible evidence submitted to the Court does not establish that Trooper Burke saw a windshield crack prior to initiating the traffic stop. Thus, the Court concludes that any observation of a cracked windshield occurred after Trooper Burke had initiated the stop.

[2] The Court notes that in addition to the dashboard video introduced as Government Exhibit 1, Defendant introduced a similar video of the stop as Defendant's Exhibit 6, which contains the recordings from two separate cameras. On Defendant Exhibit 6, Camera 1/Video-1 is the same view captured in Government Exhibit 1 and Camera 3/Video-1 is the recording captured by a camera inside Trooper Burke's vehicle. The Court notes that the time stamp on this video is one hour earlier than the times established by the other evidence in the record. The Court attributes this difference to daylight savings time.

[3] As Burke's testimony and statements captured on the video make clear, Trooper Burke had participated in a few prior stops that included participation of immigration officers, including Arsenault. See, e.g., 12/20/17 Tr. (ECF No. 42), PageID # 204; Gov't Ex. 1T at 11, 13. Burke also had previously called ICE during another traffic stop and received confirmation that a permanent ID was valid. See Gov't Ex. 1T at 21.

2

IDs." (Gov't Ex. 1T at 2.) Burke indicated he thought Arsenault should "come out." (Id.) At that point, based on his training and twenty-seven years of law enforcement experience, Burke believed that the traffic stop would "lead to people from out of this country" and, as a result, he would need ICE assistance in identifying the van occupants, who Burke then intended to summons for seat belt violations. (12/20/17 Tr. (ECF No. 42), PageID # 184.) Arsenault asked Burke if he could get any IDs or consulate cards. Burke then left Arsenault on hold while he returned to the van. At that point, the driver of the van produced identification. Burke returned to his vehicle and reported to Arsenault that he now had a "Mexico Consular ID card." (Gov't Ex. 1T at 3.) In response, Arsenault indicated he would call Burke back once he had booted his computer up.[4]

While waiting for the return call, Trooper Burke called the van registration into the Gray Regional Communication Center and requested back-up. He then went back to the van and obtained identifications from some passengers, including the Defendant, who produced a Honduran Consulate card with the name, "Mario Ernesto Garcia Zavala." (Gov't Ex. 2.) At that time, Burke told the van occupants, "You gotta stay here. Don't leave." (Gov't Ex. 1T at 4.) He then returned to his vehicle and photographed the identification cards provided and sent those photographs to Arsenault at approximately 12:25 PM. Burke also attempted to determine whether any of the van passengers had a valid driver's license that would allow them to drive the van from the scene since it appeared the current driver was unlicensed.

Trooper Jason Cooley arrived on the scene to provide Trooper Burke's requested back-up at approximately 12:32 PM, twelve minutes after the traffic stop was initiated. Upon Cooley's arrival, Trooper Burke described the van's occupants as an "ICE motherload" and "sketchy as

---

[4] As Officer Arsenault testified, he was off duty and out of state visiting family on this particular Saturday. (12/20/17 Tr., PageID # 99.)

hell." (Gov't Ex. 1T at 5.) Both Cooley and Burke inspected the IDs that had been presented.[5] At this point, both troopers were unsure of whether ICE officers would respond to the scene and Trooper Burke indicated that the ICE was "just getting started." (Gov't Ex. 1T at 7.) At approximately 12:40 PM, the Troopers returned to the van in an attempt to gather further information and identify the two passengers that had not produced any identification. Five minutes later, Trooper Burke called dispatch to run driver's license checks based on the identifying information gathered. He also asked dispatch to begin the process of calling a tow truck to the scene if dispatch confirmed that the driver did not have a valid driver's license.

By 12:41 PM, Deportation Officer Arsenault had determined that Garcia-Zavala was suspected of reentry after removal. He communicated that information to his colleague, ICE Officer John Lenotte, who was in Maine and potentially able to go to the scene. Upon receiving confirmation that Lenotte, along with ICE Officer Patrick Mullen, were responding to the scene of the stop, he communicated the reentry information to Burke via text. He then called Burke and told him that it would take another 20-30 minutes to get ICE officers to the scene. Trooper Burke indicated he could hold the van occupants "as long as you want." (Gov't Ex. 1T at 11.) Burke also explained that it was his intention to arrest the driver of the van for driving without a license and have the van towed, since it did not appear that any occupant of the van was a licensed driver.

By 12:57 PM, Trooper Burke explained to the occupants of the van that he planned to write each occupant a ticket for failing to wear a seat belt and that this process of issuing tickets would take half an hour. After telling the van occupants that they would have to wait for these tickets, Burke returned to his cruiser and told Cooley, "They bought that. Hook, line and sinker." (Gov't Ex. 1T at 15.) Trooper Burke returned to the van with the first ticket approximately five minutes

---

[5] At approximately 12:36 PM, Trooper Burke took a one-minute phone call from his wife. However, in the cruiser video (Def. Ex. 6, Camera 3), he can be seen simultaneously working on photographing IDs.

4

later.[6] At approximately the same time, two local attorneys, Elizabeth Stout and Elisabeth Stickney, began observing the traffic stop from the Tukey's Bridge walkway and attempting to communicate with the occupants of the van for the purpose of informing the van occupants about their legal rights.[7] At approximately 1:19 PM, the tow truck arrived and Trooper Burke indicated to the tow truck driver that they would await the arrival of ICE before towing the vehicle. Approximately ten minutes later, Trooper Burke texted Officer Arsenault for an estimated arrival time and, in response, was told five to ten minutes. Ten minutes later, in response to inquiries from Attorney Stickney, Trooper Burke represented that the scene was "an ongoing investigation." (Gov't Ex. 1T at 33.) In the colloquy that followed between Burke and Stickney, Burke gave conflicting representations about the status of the van occupants.[8]

At 1:39 PM, Officer Patrick Mullen, the local ICE supervisor, arrived on the scene. Lenotte arrived a few minutes later, having traveled to the scene with his blue lights and siren activated. By the time both ICE officers arrived at the scene, they had received information from Arsenault that Garcia-Zavala was subject to detention for illegal reentry. Lenotte approached Garcia-Zavala

---

[6] While awaiting the arrival of ICE officers and a tow truck, Burke and Cooley discussed a number of extraneous matters. Among them, Burke joked to Cooley that there was "no way that Flannagan's gonna beat me this month." (Gov't Ex. 1T at 13.) Burke credibly testified at the hearing that this comment was a reference to an informal competition he had with a new trooper regarding who could have the most arrests or summons issued in a given month. Burke suggested to Cooley that the ICE arrests he was anticipating could be added to his count for purposes of his competition with Flannagan. (Gov't Ex. 1T at 32.) While Defense counsel suggested in both his questioning of Burke and his briefing that there was a "racial component" to this contest, on the record presented, Defendant has not established that the informal contest between Burke and Flannagan had a racial component. (Def. Brief (ECF No. 43), PageID # 252.)

[7] Attorney Stickney, an immigration lawyer, testified at the hearing that she was called to the scene by Attorney Stout, who was concerned that there was an immigration problem associated with the two state trooper cars and the van, which she noted as having a number of Latino men inside. (12/20/17 Tr., Page ID # 236-37.) Ultimately, Attorney Stickney provided assistance to Trooper Burke in communicating with the driver and also ended up directing the van occupants who were not taken into custody as to how they could access public transportation.

[8] Compare Gov't Ex. 1T at 33 ("It's not our investigation, we're just detaining them, so the more we are directed toward dealing with you, the more it takes away from our investigation here and watching them.") with Gov't Ex 1T at 34 ("[T]hey are not under arrest, they're not being detained.")

in the van. Although no *Miranda* warning was administered, Lenotte asked Garcia-Zavala for his name and date of birth; in response, Garcia-Zavala provided answers matching the information on the Honduran consulate card that had already been provided to Trooper Burke in connection with the traffic stop.[9]

Trooper Burke ultimately arrested the driver of the van for operating without a license. However, he ultimately did not issue citations to the van passengers for seat belt violations. (12/20/17 Tr., PageID # 154.)

**Garcia-Zavala's Arrest & Subsequent Custody**

At approximately 1:56 PM, the dashboard video shows the ICE officers taking Garcia-Zavala into custody. Lenotte followed their standard process of placing Garcia-Zavala in administrative custody and transporting him to the ICE office in South Portland for booking.[10] Fingerprints and additional record checks conducted at the office confirmed Garcia-Zavala's prior 2014 removal. After the booking was complete, Garcia-Zavala was transported to Cumberland County Jail, where ICE paid to house him.

On the following Monday, September 11, 2017, Lenotte transported Garcia-Zavala from the jail back to the ICE office. At that time, Lenotte administered a *Miranda* warning with the assistance of a telephonic interpreter. Garcia-Zavala invoked his right to remain silent and was returned to the Cumberland County Jail. Lenotte continued his investigation of Garcia-Zavala by obtaining his alien file, which Lenotte did not receive until Friday, September 15, 2017. By the following Monday, September 18, 2017, Lenotte had transmitted the necessary paperwork to the

---

[9] Garcia-Zavala also admitted that he was in the country illegally in response to Lenotte's questioning. (12/20/17 Tr., PageID # 219.) However, the Government has indicated that it would not attempt to use this admission in connection with this case.

[10] Lenotte testified that custody is "always administrative" unless there is "a criminal arrest warrant on scene." (12/20/17 Tr., PageID # 220.)

6

U.S. Attorney's Office with a recommendation for criminal prosecution and the U.S. Attorney's Office accepted that recommendation. As a result, a criminal complaint was prepared and presented to the Magistrate Judge on September 19, 2017. On that same day, a criminal arrest warrant was issued for Garcia-Zavala, who remained in custody at the Cumberland County Jail. Garcia-Zavala made his initial appearance before the Court on September 22, 2017 (ECF No. 8) and, on that same day, was transferred to the custody of the U.S. Marshal. Although the entity holding Garcia-Zavala changed, he remained housed in a local jail.

All told, Garcia-Zavala was in custody for thirteen days before making his initial appearance on the pending charge.

## II. DISCUSSION

The Court first addresses the Motion to Dismiss, recognizing that if a dismissal were granted, the Motion to Suppress would be moot.

### A. Motion to Dismiss

Defendant's Motion to Dismiss argues that there was "unnecessary delay" in Garcia-Zavala's initial appearance in violation of Federal Rule of Criminal Procedure 5(a). This argument assumes that Garcia-Zavala was in criminal custody from the moment he was seized by ICE on September 9, 2017. However, the Government argues and the record establishes that Garcia-Zavala did not come into criminal custody until September 22, 2017, the day that ICE officials brought him to this courthouse for his initial appearance.

The record in this case is materially indistinguishable from the governing First Circuit precedents laid out in United States v. Encarnacion, 239 F.3d 395 (1st Cir. 2001) and United States v. Tejada, 255 F.3d 1 (1st Cir. 2001). In Encarnacion, the defendant was initially processed and detained civilly under 8 U.S.C. § 1357(a)(2), which applies to status offenses. Encarnacion was

7

then detained for eight days prior to making his initial appearance on a charge of violating 8 U.S.C. § 1326, the same criminal charge Garcia-Zavala now faces. In affirming the denial of Encarnacion's motion to dismiss, the First Circuit explained that "Rule 5(a) generally does not protect § 1357(a)(2) civil detainees." Encarnacion, 239 F.3d at 398-99; see also Tejada, 255 F.3d at 3 (explaining that "status offense[s] . . . do not trigger the protections of Rule 5(a) until the criminal process has been initiated against the detained alien").

Here, "there is no evidence that [Garcia-Zavala] initially was detained for any reason other than routine inquiry into his suspicious immigration status—a civil matter." Tejada, 255 F.3d at 4. Also, the investigation undertaken between the time Garcia-Zavala was taken into custody and the time he was charged criminally did not use "delaying tactics for an impermissible purpose." Id. The First Circuit made similar findings in Tejada. See id. Based on these findings, the First Circuit concluded that Tejada's civil custody allowably continued for sixteen days until shortly before his initial appearance. Id. at 2, 5. In this case, Garcia-Zavala was held for thirteen days before his initial appearance. Following Tejada and Encarnacion, the detention of Garcia-Zavala prior to September 22, 2017, cannot be deemed a violation of Federal Rule of Civil Procedure 5.

Alternatively, the Court notes that courts have held that the suppression of statements made during the delay—rather than dismissal—is the appropriate remedy for a delayed presentment in violation of Rule 5. See, e.g., United States v. Jacques, 744 F.3d 804, 813 (1st Cir. 2014) (noting that "the *McNabb–Mallory* rule established by the Supreme Court stipulates that confessions made during a period of detention that violates the prompt presentment requirement of Rule 5(a) are generally inadmissible in federal courts"). In the case of Garcia-Zavala, there are no statements to suppress and he has not shown prejudice resulting from the arguable delay that preceded his initial appearance on September 22, 2017. Under similar circumstances, the First Circuit has refused to

say that delay in complying with Rule 5(a) can serve as a basis for dismissal. See United States v. Mangual-Santiago, 562 F.3d 411, 432 (1st Cir. 2009); Encarnacion, 239 F.3d at 400 n.5 (declining to decide "whether Rule 5(a) can ever be a basis for dismissal of an indictment absent evidence of unwarranted interrogation during the period of detention").

In short, on the record presented, the Court concludes that there was no Rule 5 violation. Additionally, even if the record were viewed as exhibiting unnecessary delay in Garcia-Zavala's initial appearance, the First Circuit has not recognized dismissal as an appropriate remedy for a presentment delay in these circumstances.

### B. Motion to Suppress

Turning to Defendant's Motion to Suppress, Defendant makes three arguments: (1) the stop was pretextual; (2) the stop was unlawfully extended to assist ICE; and (3) the proper remedy for this unlawful stop is suppression of all information gained about Garcia-Zavala as a result of the stop, including his identity. The Court concludes that all three arguments fail under existing precedents.

#### 1. The initial traffic stop did not violate Garcia-Zavala's Fourth Amendment rights.

It is well established that "when a police officer makes a traffic stop, both the driver of the vehicle and the passengers within it are seized within the meaning of the Fourth Amendment." United States v. Hillaire, 857 F.3d 128, 129 (1st Cir. 2017). In this case, Trooper Burke's traffic stop was justified at its inception by objectively reasonable suspicion of a seat belt violation by the front seat passenger. See United States v. Orth, 873 F.3d 349, 354 (1st Cir. 2017) ("An officer's actions must be justified at their inception . . . .") To the extent that Defendant has argued that the

stop was racially motivated from the moment it was initiated, the record presented does not provide factual support for that assertion.[11] See, e.g., United States v. Ramdihall, 859 F.3d 80, 94 (1st Cir. 2017) (*citing* Whren v. United States, 517 U.S. 806, 813 (1996)).

"Once the police stop a vehicle, 'the tolerable duration of police inquiries . . . is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns.'" United States v. Clark, 879 F.3d 1, 4 (1st Cir. 2018) (quoting Rodriguez v. United States, 135 S. Ct. 1609, 1614 (2015)). In this case, Trooper Burke determined within minutes of initiating the stop that multiple passengers were not wearing seat belts and also developed a reasonable suspicion that the driver of the van did not have a valid driver's license. Thus, the mission of addressing one passenger seat belt violation quickly morphed into addressing multiple seat belt violations by multiple van occupants, which in turn justified Trooper Burke's attempts to identify these passengers. See Orth, 873 F.3d at 354 ("[C]ircumstances and unfolding events during a traffic stop allow for an officer to 'shift his focus and increase the scope of his investigation'") (quoting United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001); United States v. Fernandez, 600 F.3d 56, 62 (1st Cir. 2010) (holding that no Fourth Amendment violation occurred when an officer sought identification of a passenger in order to issue a seat belt citation).

Even absent reasonable suspicion of criminal activity, "an officer can undertake checks unrelated to the purpose of the stop so long as those checks do not prolong the stop." United States v. Dion, 859 F.3d 114, 123-24 (1st Cir.), cert. denied, 138 S. Ct. 346 (2017). While the Court concludes that Burke's call to ICE is most appropriately viewed as part and parcel of his attempts

---

[11] In his post-hearing briefing, Defendant has cited both 29-A M.R.S.A §§ 1408 & 2018(4) as a basis for this Court to find that Burke could not stop the van for reasonable articulable suspicion of a seat belt violation. See Def. Post-Hearing Memo, PageID # 265-66. The Court disagrees with Defendant's reading of the cited Maine statutes and notes that Judge Woodcock has similarly upheld a stop based on an observed seat belt violation. See United States v. Williams, D. Me No. 1:15-cr-156-JAW, 2017 WL 435725, *3 (D. Me. Feb. 1, 2017).

to verify the identification of each of the van occupants, the Court alternatively notes that even if the ICE check is categorized as "unrelated to the purpose of the stop," the check does not run afoul of the Fourth Amendment unless and until it is deemed to have prolonged the stop. See Rodriguez, 135 S. Ct. at 1616 (explaining that the "critical question" is "whether conducting the sniff 'prolongs'—i.e., adds time to—'the stop'"). Thus, the Court turns to the issue of the length of the stop.

### 2. The length of the stop did not violate Garcia-Zavala's Fourth Amendment rights.

Having concluded that Trooper Burke's actions were "justified at their inception," his "subsequent actions are measured by the 'emerging tableau' of circumstances as the stop unfolds." Orth, 873 F.3d at 354 (quoting Chhien, 266 F.3d at 6). As the Government asserts, the circumstances in this case include the fact that approximately twenty-one minutes into the traffic stop "the undisputedly reliable information in the possession of law enforcement . . . was that [Garcia-Zavala] had previously been removed from the United States and was unlawfully present in the country."[12] (Gov't Post-Hearing Brief (ECF No. 44), Page ID # 286.) In light of the fact that it took one hour for Trooper Burke to determine that there was no licensed driver for the van and to have a tow truck respond to the scene, the Court readily concludes that probable cause to arrest Garcia-Zavala was developed within the time a reasonably diligent officer would have

---

[12] Implicit in this assertion is the Government's application of the collective knowledge doctrine to combine the observations of Trooper Burke and the research completed by Officer Arsenault. See United States v. Brown, 621 F.3d 48, 57 (1st Cir. 2010) ("In this circuit, we have recognized the collective knowledge doctrine as a legitimate means through which reasonable suspicion may be established."); United States v. Winchenbach, 197 F.3d 548, 555 (1st Cir. 1999) (explaining that in assessing probable cause "the focus is upon the collective knowledge possessed by, and the aggregate information available to, all the officers involved in the investigation"). To the extent that Defendant has argued that the databases used by the ICE officers are unreliable and could not be used as part of the "collective knowledge" to develop probable cause as to Garcia-Zavala's immigration status, the Court notes that the record is devoid of any evidence that the databases used contained inaccurate information generally, or as related to Garcia-Zavala specifically. Thus, Defendant's argument is without merit.

needed to complete this traffic stop. See, e.g., United States v. Owens, 167 F.3d 739, 749 (1st Cir. 1999) (finding a traffic stop that involved a "fifty-minute detention" to be "lengthy" but reasonable under the circumstances).

To be clear, the Court readily determines that the initial hour of this Saturday afternoon traffic stop was spent on inquiries incident to the traffic stop, including "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Rodriguez, 135 S. Ct. at 1615 (citing Delaware v. Prouse, 440 U.S. 648, 658–660 (1979)). The time needed to complete these inquiries was extended as a result of the language barrier as well as the number of occupants in the van and the time it took each occupant to produce identification. However, the Court concludes that the time needed to obtain and verify the identity of each passenger falls into the category of "negligibly burdensome precautions" that may be undertaken by a police officer during a traffic stop. Clark, 879 F.3d at 5.

However, the Court also acknowledges that the timeline here is subject to differing interpretations. Defendant looks at the time that passed from the initiation of the traffic stop until the moment that Garcia-Zavala was taken into custody by ICE officers; this amounts to approximately one hour and thirty-five minutes. The Government urges the Court to focus on the amount of time that passed from the initiation of the traffic stop until the moment that law enforcement developed probable cause of Garcia-Zavala's immigration violation; this amounts to approximately twenty-five minutes. The Government presents the better argument with respect to Garcia-Zavala given the totality of the circumstances involved in this traffic stop. Therefore, the Court concludes that the length of the stop did not violate Garcia-Zavala's Fourth Amendment rights given the relatively short time frame in which the officers involved collectively developed

probable cause to believe that Garcia-Zavala was unlawfully present after having been previously removed.

Notwithstanding this conclusion, the Court notes Defendant also appears to argue that the probable cause that justified ICE officers taking Garcia-Zavala into administrative custody pursuant to 8 U.S.C. § 1357(a) did not simultaneously provide legal authority for a state official, such as Trooper Burke, to arrest or detain Garcia-Zavala. See generally 8 U.S.C. § 1357(g); Arizona v. United States, 567 U.S. 387 (2012).[13] In the context of this case, the Court need not and does not resolve this question. Rather, for reasons explained in the following section, the Court concludes a suppression remedy is not available to Garcia-Zavala regardless of the merits of this particular argument.

### 3. The identity information obtained during the stop is not subject to suppression under existing precedent.

Even if the traffic stop was deemed pretextual or unjustifiably long, the Government has indicated that the only evidence it seeks to use in this prosecution is "limited to statements about biographical and identification matters that are part of the required booking process." (Gov't Response (ECF No. 32), PageID # 72 & Gov't Post-Hearing Brief (ECF No. 44), PageID # 293.) Such identity information is not subject to suppression under the "identity statement" exception of INS v. Lopez-Mendoza, 468 U.S. 1032 (1984). In Lopez-Mendoza, the Supreme Court explained that "[t]he 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never

---

[13] The Court notes that the cited statute and case were first brought to the Court's attention in the closing paragraphs of Defendant's Post-Hearing Reply Brief (ECF No. 45). Given the Government's lack of opportunity to respond and the Court's determination that its ruling on the Motion to Suppress would be the same regardless of its determination of this question, the issue is noted but not resolved in this case. But see United States v. Ovando-Garzo, 752 F.3d 1161 (8th Cir. 2014) (affirming denial of a motion to suppress upon finding that the state officer did not act unilaterally in detaining defendant until Border Control could take defendant into custody).

itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred." Lopez-Mendoza, 468 U.S. at 1039. Citing this precedent, the First Circuit refused to suppress the identity of an alien in connection with its review of a removal proceeding. See Navarro-Chalan v. Ashcroft, 359 F.3d 19, 22 (1st Cir. 2004) ("Navarro's name is not information even subject to being suppressed. The identity of an alien, or even a defendant, is never itself suppressible . . . ." (internal quotations omitted)); see also Garcia-Aguilar v. Lynch, 806 F.3d 671, 676-77 (1st Cir. 2015) (affirming denial of a request to suppress a birth certificate in the context of a removal proceeding).

Defendant has acknowledged both Lopez-Mendoza and Navarro-Chalan as well as three district court decisions within the First Circuit that apply these cases to conclude that identity is an exception to the exclusion remedy. (See Def. Post-Hearing Mem. (ECF No. 43), PageID # 254.) Nonetheless, Defendant urges this Court to consider the existence of a circuit split on this issue. Compare, e.g., United States v. Garcia-Garcia, 633 F.3d 608, 616 (7th Cir. 2011) (holding that "identity may not be suppressed even if it was obtained in violation of the Fourth Amendment"); United States v. Farias-Gonzalez, 556 F.3d 1181, 1189 (11th Cir. 2009)("hold[ing] that the exclusionary rule does not apply to evidence to establish the defendant's identity in a criminal prosecution"), with United States v. Oscar-Torres, 507 F.3d 224, 232 (4th Cir. 2007) (holding that illegally obtained fingerprint evidence could be suppressed); United States v. Olivares-Rangel, 458 F.3d 1104, 1112 (10th Cir. 2006) ("[T]he 'identity' language in Lopez–Mendoza . . . does not apply to evidentiary issues pertaining to the admissibility of evidence obtained as a result of an illegal arrest and challenged in a criminal proceeding.") Additionally, Defendant argues that the First Circuit's more recent opinion in Corado-Arriaza v. Lynch, 844 F.3d 74 (1st Cir. 2016) "suggests that it would be willing to allow suppression of identity evidence in the criminal

14

context." (Def. Post-Hearing Mem., PageID # 255.)  Quite simply, the Court disagrees with Defendant's reading of Corado-Arriaza as opening the door for this Court to disregard the plain language of Lopez-Mendoza and Navarro-Chalan.

However, assuming for the moment there is no categorical bar on the suppression of the identity information that was obtained from Garcia-Zavala, the Court would still conclude that exclusion is not an appropriate remedy in this case.  In United States v. Sandoval-Vasquez, 519 F. Supp. 2d 198 (D. Mass. 2007), Judge Stearns similarly faced a request to suppress identity information where a defendant was charged with a violation of 8 U.S.C. § 1326.  Noting the continuing nature of the violation, Judge Stearns recognized that application of the exclusionary rule would serve no purpose.  See Sandoval-Vasquez, 519 F. Supp. 2d at 201 ("Empty gestures do not further the primary purpose of the exclusionary rule, which is not to confer personal rights on criminal defendants, but to deter unlawful government conduct.")

More recently, other circuits have likewise recognized that application of the exclusionary rule to identity evidence in similar types of immigration cases is not appropriate because the minimal deterrence benefits do not outweigh the costs.  See, e.g., United States v. Chagoya-Morales, 859 F.3d 411, 417-420 (7th Cir. 2017); Farias-Gonzalez, 556 F.3d at 1187-88.  The Court is satisfied that even if the First Circuit were to change course and recognize that there was no longer an identity statement exception, it would nonetheless follow the reasoning found in Chagoya-Morales and Farias-Gonzalez to conclude that the exclusionary rule may not be applied to the identity information obtained during this traffic stop.

## III. CONCLUSION

For the reasons just explained, the Court DENIES Defendant's Motion to Suppress (ECF No. 29) and his Motion to Dismiss (ECF No. 31).

SO ORDERED.

                                                /s/ George Z. Singal
                                               United States District Judge

Dated this 28th day of February, 2018.